UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
——

JOEL NATHAN DUFRESNE,

                 Petitioner,                Case No. 1:12-cv-1210

v.                                          Honorable Paul L. Maloney

CARMEN PALMER

                 Respondent.

_____/

## OPINION

Petitioner Joel Nathan Dufresne presently is incarcerated at the Chippewa Correctional Facility.  Following a jury trial in the Emmet County Circuit Court, Petitioner was convicted of six counts of third-degree criminal sexual conduct (CSC III) involving force or coercion, MICH. COMP. LAWS § 520d(1)(b), and three counts of first-degree criminal sexual conduct (CSC I) involving personal injury, MICH. COMP. LAWS § 750.520b(1)(f).  On September 22, 2006, the trial court sentenced him to six terms of imprisonment of 25 to 50 years for the CSC III convictions and three terms of 50 to 75 years for the CSC I convictions.  In his *pro se* petition, Petitioner raises five grounds for relief, as follows:

     I.      TRIAL DEFENSE COUNSEL, WITH NO STRATEGIC PURPOSE, FAILED TO INTERVIEW AND PRESENT WITNESSES, AND FAILED TO INVESTIGATE AND PRESENT FACTS, ALL OF WHICH WOULD HAVE SUPPORTED PETITIONER'S CLAIM THAT THE SEXUAL CONDUCT FOR WHICH HE HAS BEEN SENTENCED TO 50-75 YEARS IN PRISON WAS CONSENSUAL, AND THAT THE UNSUPPORTED AND UNCORROBORATED CLAIMS OF COMPLAINANT WERE LACKING IN CREDIBILITY. AS A RESULT OF THESE AND OTHER FAILURES, INCLUDING FAILURE TO INVESTIGATE AND PRESENT AT TRIAL CRITICAL IMPEACHING MATERIAL CONTAINED IN TAPED INTERVIEWS OF PETITIONER AND COMPLAINANT, AND FAILURE TO

OBJECT TO INADMISSIBLE AND PREJUDICIAL EVIDENCE AGAINST PETITIONER, PETITIONER DUFRESNE WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL GUARANTEED BY THE FEDERAL CONSTITUTION (U.S. CONST. AMEND. VI).

    A.    FAILURE TO INVESTIGATE PRIOR STATEMENTS OF PETITIONER AND COMPLAINANT AND FAILURE TO INTRODUCE CRITICAL IMPEACHING MATERIAL FROM THESE STATEMENTS.

    B.    TRIAL DEFENSE COUNSEL'S FAILURE TO INVESTIGATE AND PRESENT FACT WITNESSES AND GENERAL FACTS PERTAINING TO COMPLAINANT'S CREDIBILITY.

II.    PETITIONER WAS DENIED HIS FEDERAL DUE PROCESS RIGHT TO PRESENT A DEFENSE, AND HIS FEDERAL CONSTITUTIONAL RIGHT TO CONFRONTATION (U.S. CONST., AMENDS. V, VI & XIV), WHEN WITNESS INTIMIDATION, AND RULINGS OF THE TRIAL COURT, ALONG WITH INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL (ISSUE I, SUPRA), PROHIBITED EXPLORATION OF AREAS CRITICAL TO FACTUAL SUPPORT OF HIS DEFENSE THAT THE CHARGES IN THIS CASE RESULTED FROM A FALSE ALLEGATION.

III.    PETITIONER DUFRESNE WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL GUARANTEED BY THE FEDERAL CONSTITUTION (U.S. CONST. AMEND. VI) WHERE HIS APPELLATE COUNSEL, ON DIRECT APPEAL, NEGLECTED "DEAD BANG WINNERS."

IV.    THE MICHIGAN COURT OF APPEALS UNREASONABLY APPLIED *DOYLE V. OHIO*, AND ISSUED AN OPINION THAT WAS CONTRARY TO *DOYLE*, WHEN IT CITED A STATE CASE FOR THE PROPOSITION THAT FAILURE TO 'IMPUGN THE REQUEST FOR COUNSEL' OR 'CREATE ANY INFERENCE FROM THE INVOCATION OF THE RIGHT TO COUNSEL' ABSOLVED THE STATE FROM CONSEQUENCES OF REPEATED *DOYLE* ERROR.

V.    THE MICHIGAN COURT OF APPEALS, ON DIRECT REVIEW, UNREASONABLY APPLIED CLEAR UNITED STATES SUPREME COURT PRECEDENT, AND UNREASONABLY DETERMINED THE FACTS, WHEN IT RULED THAT PETITIONER'S DUE PROCESS RIGHT TO A FAIR TRIAL (U.S. CONST. AMENDS. V, XIV) WAS NOT VIOLATED WHEN THE PROSECUTOR ENGAGED IN SEVERE AND

REPEATED OUTCOME-DETERMINATIVE MISCONDUCT BY ASKING ABOUT PETITIONER'S CHARACTER– THAT HE HAD TIES TO A WHITE SUPREMACIST GROUP THAT WAS INVOLVED WITH THE MURDER OF A JUDGE'S FAMILY IN CHICAGO (A FALSE AND HIGHLY PREJUDICIAL CLAIM).

(Br. in Supp. of Pet., ECF No. 1, PageID.9-10.)

Respondent has filed an answer to the petition (ECF No. 7) stating that the grounds should be denied because the claims are either noncognizable, procedurally defaulted or without merit. Upon review and applying the AEDPA standards, the Court concludes that Grounds III, IV and V are without merit and Grounds I and II are procedurally defaulted. Accordingly, the Court will deny petition.

**Procedural and Factual Background**

I.      Trial Proceedings

The state prosecution arose from the following circumstances, as summarized by the Michigan Court of Appeals:

Defendant's convictions arose out of multiple forced sexual acts with his former girlfriend. The girlfriend testified that defendant threatened to kill her, her daughters, and her parents if she reported the acts to law enforcement authorities. She further testified that defendant told her that he would take their son away from her if she refused to participate in the sexual acts.

(10/14/08 Mich. Ct. App. Op., 1, ECF No. 32.) Petitioner was charged with six counts of CSC I, twelve counts of CSC III, and extortion. Following a preliminary examination on April 3, 2006, he was bound over on all of the CSC charges. (Prelim. Exam. Tr. (PE), 81-82, ECF No. 10.) The district court declined to bind Petitioner over on the extortion count. Thereafter, the prosecutor dismissed six counts of CSC III. The prosecutor also filed an amended information charging petitioner as a habitual offender, fourth offense. (Reg. of Action, 2, ECF No. 9.) Petitioner was tried before a jury beginning

August 16, 2006, and concluding on August 18, 2006.  (Trial Transcripts TT I to TT III, ECF No. 12-14.)

At trial, the jury heard the competing versions of events described by Angela Wiertalla and Petitioner.  Wiertalla testified that she met Petitioner in October 2003, and they became romantically involved in the latter part of that year.  (TT I, 197-99.)  In March 2004, Wiertalla became pregnant with their son (Hale).  (*Id.*, 200.)  While Petitioner initially was kind, the relationship became abusive, with Petitioner threatening to take the child, claiming that Wiertalla's past drug problems would enable Petitioner to obtain custody of Hale and cause Wiertalla to lose her two other children.  He also threatened to hurt Wiertalla's parents.  Beginning in September 2004, Petitioner repeatedly beat Wiertalla, often hitting her in the head.  (*Id.*, 203-06, 211-17, 225-28.)

In February or March 2005, they moved into a trailer next door to Wiertalla's parents.  (*Id.*, PageID.208.)  After that, Petitioner constantly demeaned Wiertalla and hit her more frequently.  In March, 2005, he beat her severely before driving off.  (*Id.*, 213-214.)  Wiertalla began walking to the emergency room, but Petitioner picked her up on the road, brought her home, and beat her some more.  (*Id.*, 214-17.)  Wiertalla called into work sick, because she was badly hurt.  She went to the doctor, but she told the doctor that a pregnant woman had beaten her because Wiertalla had suggested that the woman should not have been drinking.  (*Id.*, 217.)  Wiertalla testified that she did not tell anyone, because she was afraid of losing her children.  (*Id.*, 218.)

In September 2004, Petitioner got mad at Wiertalla for going to a barbeque at her cousin's house.  Petitioner yelled at her over the phone and for the first time threatened to take the baby with him when it was born.  Petitioner eventually joined her at the barbeque.  Petitioner took her into a bedroom and began choking her, demanding to know what she had done.  (*Id.*, 202-03.)  Petitioner

-4-

continued, off an on, for some time.  Wiertalla went outside, and Petitioner grabbed  her by the hair and started dragging her down the road.  She fell and injured her pelvic cartilage.  Petitioner punched her repeatedly in the head.  (*Id.*, 203.)  Wiertalla went to the emergency room the next day.  When she found out that the hospital intended to inform the police about the assault, she left.  The police came to her house while she was sitting on her porch with Petitioner.  Wiertalla lied to the police about what had happened.  (*Id.*, 203-04.)

Petitioner was involved with a white supremacist group, and he coerced Wiertalla to participate.  (*Id.*, 219-21.)  In June 2005, he compelled her to attend a barbeque near Cadillac or Mesick, which was a gathering of members of the group.  (*Id.*, 222-25.)  Because Petitioner did not like her behavior, he punched her in the mouth and made her sit in the car.  (*Id.*, 224-25.)  Later, she went back out to the fire pit, and Petitioner subsequently beat  her severely.  She hit him with a stick she found.  (*Id.*, 229.)  Wiertalla looked for Petitioner later, and, having learned he went to the Uma Bar, she went too.  Petitioner beat her in the parking lot of the bar.  (*Id.*, 227-28.)  She eventually ran to a house, ending up on the porch.  Petitioner attempted to push his penis into her mouth, telling her she needed to drink his urine.  (*Id.*, 229, 232.)  The police found her on the porch in Petitioner's presence. (*Id.*, PageID. 228.)  She lied to them about what had happened.  They took her by ambulance to the Traverse City hospital.  (*Id.*, 232.)

The day she returned home from the hospital, her mouth was still split open.  Petitioner came into the bathroom while she was on the toilet and insisted that she suck his penis, despite the fact that she told him it hurt too much.  He punched her in the side of the head to force her to comply.  (*Id.*, 235.)  The following day, while she was recovering and sleeping on the couch, he woke her and demanded that she turn over.  She cried and said that she did not want to, but he pulled down her

pajama bottoms and shoved three fingers, as hard as he could, into her anus. She screamed and cried, but he continued. (*Id.*, 237.) When he left, she fell back asleep, only to wake and find him masturbating over her. He ejaculated onto her face and refused to allow her to wipe it off. (*Id.*, 238.) Wiertalla was afraid to tell anyone what was happening, as Petitioner threatened to take her son and kill her family if she told. (*Id.*, 238-39.) In the middle of November, Petitioner suddenly took their son to Florida to visit family, ostensibly for four or five days, but he did not return until December 2, 2005. (*Id.*, 240.) He left for Florida again on December 16 or 17, where he stayed through Christmas. (*Id.*, 241.) Wiertalla was afraid that Petitioner would not return with her son. (*Id.*, 244.) While Petitioner was in Florida, he made sexual demands on Wiertalla. He insisted that she arrange a threesome, or she would never see Hale again. She pretended to do so. (*Id.*, 242; TT II, 35.) Subsequently, he told her to set up the web camera, so that he could watch her masturbate. (*Id.*, 242.) Petitioner demanded that she put a broom handle up her anus, telling her that she would not hear from her son until she did it. Wiertalla acceded in the demand, to the extent that she showed him the base of a Fisher Price ring toy. Petitioner demanded that she insert the column into her anus repeatedly. Petitioner would not let her stop despite repeated requests. (*Id.*, 243.) Petitioner then demanded that she describe how she would perform oral sex with a woman, insisting that she continue until he was satisfied with the description. (*Id.*, 243-44.)

Petitioner returned from Florida on December 29 or 30, 2005. (TT II, 7.) When he came back, he insisted that Wiertalla masturbate for him while he was on the phone, despite her protests. He then took her into the shower and told her to bend over. She again told him that she did not want to, but he bent her over and inserted his penis in her anus. After he took it out, he turned her around, made her get on her knees, and take his penis in her mouth, telling her to clean

it off.  (*Id.*, 8.)  Wiertalla was crying and begging Petitioner not to make her do it, but he threatened to beat her.  When she complied, he urinated in her mouth.  (*Id.*, 9.)  Petitioner used the Fisher Price toy to penetrate Wiertalla anally on two occasions in January 2006, before she hid it.  On both occasions, he made her clean it off in her mouth.  (TT I, 260; TT II 10-11, 13.)  The anal penetrations cause her to bleed for two days.  Petitioner thereafter daily demanded anal sex, to the point that she had fecal incontinence one day when she was preparing for work.  (TT II, 15.)  On January 25, 2006, Petitioner tied Wiertalla to Hale's crib, blindfolded her, and pushed a vibrator into her anus.  He then forced her to clean it off in her mouth.  Petitioner took his fingernail and dug around in her buttocks before putting his penis in her anus and ejaculating.  (*Id.*, 16.)  Wiertalla testified that she did not fight Petitioner because it would do no good and would only get her beaten.  (*Id.*, 17.)  She bled quite badly, and her rectum hurt for days.  (*Id.*, 18.)  A few days later, Petitioner tied her to a kitchen chair by the neck, using a receiving blanket, so that she could not move her head.  Petitioner told her that he was going to "f*ck her mouth, he was going to finish off [her] gag reflex."  (*Id.*, 18, 20.)  Petitioner ejaculated into her mouth.  The blanket was not so tight as to choke her, but it left pinch marks on her neck.  (*Id.*, 22.)  Petitioner had on other occasions tested her gag reflex by holding her head with his hands while his penis was shoved all the way down her throat, so she could not breathe.  (*Id.*, 18.)

Around February 7, Wiertalla left work early, as she was throwing up.  Her mother picked her up and brought her home.  Petitioner was out.  When he came back, Petitioner demanded that she suck his penis.  She objected, saying she was sick, but Petitioner insisted she do it anyway.  He left the room but kept returning every few minutes to wake her up and do it again.  Finally, he came in and put his fingers in her rectum.  She told him not to, as she had diarrhea, but he pulled

down her pants and inserted his penis.  When Petitioner discovered feces on his penis, he hit her in the head and called her names.  (*Id.*, 23-24.)

On Valentine's Day, Petitioner cleaned everything he wanted out of the house and took Hale with him.  At that point, knowing that Petitioner was finally gone, Wiertalla called her probation officer and told him what had happened.  The probation officer told her to wait and that he would contact someone.  Gwen White-Erickson called shortly thereafter and met with Wiertala. Wiertalla told her everything that had happened and that, she believed, Petitioner had taken her son to Florida.  (*Id.*, 248-51.)

After she had reported the incidents, the police gave her a recorder for her phone and for her parents' phone.  They recorded three telephone calls from Petitioner, one of which was played for the jury.  (TT I, 253-55; TT II, 114-15.)  During the conversations, Wiertalla brought up the things Petitioner had done, in an attempt to get Petitioner to admit those things.  (TT I, 255.)  The trial court described the conversation played for the jury, as follows:

> [T]he jury heard a tape recorded phone call between Defendant and Wiertalla[] where he apologized "for all the sick mean shit that I've done to you."  Defendant also said on the recording:  "Sorry for asking you to suck my dick after I hit you.  Sorry for testing your gag reflex."  He also said:  "Sorry about the pee.  I know the things that I did."

(5/22/08 Cir. Ct. Op. Den. Mot. for New Trial, 2, ECF No. 19.)

Wiertalla's testimony was partially corroborated by testimony from three coworkers concerning her absences from work and bruises, as well as Wiertalla's fear of Petitioner.  (TT II, 83-86, 87-89, 93-94.)  It also was partially corroborated by testimony of her doctor about an injury to her internal rectal area.  (*Id.*, 60-62.)  Further, Michigan State Police Trooper Brian Cobalt testified that he and his partner Rick Lifts found Petitioner standing over a badly wounded Wiertalla when they

-8-

came to investigate an incident near the Uma Bar. (*Id.*, 160-167.) Petitioner was intoxicated and had blood on his shirt and cuts on his hands. (*Id.*, 162.) Wiertalla was so badly injured that the officers called an ambulance, and she was transported to the hospital. (*Id.*, 166-67.)

Petitioner testified in his own defense. He corroborated a number of allegations, though he claimed the incidents were consensual, and he disputed other allegations. Much of Petitioner's testimony was unhelpful to his case, as it was unapologetic and demonstrated callousness toward degrading activities.

Petitioner contended that Wiertalla argued about everything and was jealous. (TT II, 132-33.) She complained that he did not make enough money to support them, and she began hitting him. Petitioner testified that he did not hit her back. (*Id.*, 133.) Once, while she was pregnant, Wiertalla got mad at Petitioner and was stomping and threatening to have an abortion. In response, Petitioner testified, he told her that he would kill her if she hurt the baby and that he would take the baby when he was born. (*Id.*, 136.) According to Petitioner, when Hale was born in December 2004, Petitioner was present at the hospital, and he watched the nurses carefully to prevent them from hurting Hale by sticking him with needles, and the like. He also refused to let the nurses wrap the baby in blankets, but instead wrapped him in his own shirt. When they got home from the hospital, Petitioner did not like that Wiertalla was drinking coffee and smoking. He was afraid the baby would not be taken care of. (*Id.*, 134-35.) Petitioner testified that Wiertalla suffered from postpartum depression. (*Id.*, 136.)

Petitioner described the June 2005 incident quite differently than Wiertalla, saying that he did not want Wiertalla to go to the barbeque, because she was so erratic in her behavior and because he did not want her to violate her probation by being with people who were drinking. (*Id.*, 138.)

Petitioner's recitation was not perfectly chronological, but he stated that Wiertalla became drunk, acted crazy, fell asleep in the car, ran out of the car and fell down, went to sleep, and ultimately followed Petitioner to the Uma Bar. Wiertalla asked to talk to him outside, where she started screaming at him and hitting him. He hit her back. Wiertalla shoved him and he fell. He jumped up and hit her. During one of her rages, she hit him in the head with a board. (*Id.*, 144-46.)

Petitioner testified that the relationship changed after the June 2005 incident. Petitioner tried to help Wiertalla with her postpartum depression and to be supportive, because he did not want his son to grow up without a mother. (*Id.*, 147.) Petitioner claimed that his first trip to Florida was on December 19, 2005, and he was just bringing his son to meet his mother. (*Id.*, 148.) According to Petitioner, he spoke to Wiertalla constantly while he was in Florida. He missed his flight, which was supposed to return on December 23. (*Id.*, 149-50.) Petitioner claimed that he was just joking when he talked about having a threesome, because it was a running joke between them. (*Id.*, 151.) He also claimed that the web-cam filming of sexual activity was consensual and that Wiertalla was just doing a show for him. He denied threatening Wiertalla with taking Hale. (*Id.*, 152-53.) Petitioner denied ever threatening Wiertalla, and he testified that her stories about his assaults made no sense, as the children could have walked in at any time. (*Id.*, 157.) He specifically denied tying Wiertalla up to a chair, and stated that they did not even own such a chair. (*Id.*, 164.) According to Petitioner, the two had always engaged in anal and oral sex when Wiertalla had her period and vaginal sex otherwise. (*Id.*, 165.) He admitted to accidentally urinating while Wiertalla was giving him oral sex. (*Id.*, 165.) He also admitted to "tapping" Wiertalla on the back of her head while she was performing fellatio, saying, "That's testing a gag reflex. That's a test. . . . Used to do it in high school. . . . It wasn't done in malice. It was done in joke." (*Id.*,185-187.)

At the conclusion of trial, on August 18, 2006, the jury found Petitioner guilty of three counts of CSC I and not guilty of the other three counts of CSC I.  The jury found Petitioner guilty of all six counts of CSC III.  (TT III, 51-52.)  On September 22, 2006, Petitioner was sentenced as a fourth-offense felony offender to serve prison terms of 50 to 75 years on each of the CSC-I convictions and 25 to 50 years on each of the CSC-III convictions.  (Sentencing Transcript, (S. T.), 15.)

## II.    Direct Appeal

Petitioner pursued an appeal in the Michigan Court of Appeals.  On April 30, 2007, he filed a brief on appeal and a motion to remand, raising the following three issues:

1.  It was reversible error for two police witnesses to testify that [Petitioner] asked to speak to a lawyer during his interrogation – that he had "lawyered up" in the words of one of the officers – in violation of [Petitioner's] federal and state constitutional rights.

2.  The trial court erred in admitting, the prosecution admitted misconduct by talking about, and counsel was ineffective for failing to object to prejudicial testimony regarding [Petitioner's] character – that he had ties to a white supremacist group that was involved with the murder of a judge's family in Chicago, and that he was scary and intimidating.

3.  Trooper Armstrong impermissibly testified regarding the credibility of the complainant's allegations, prejudicing the defense by vouching for the veracity of the complainant, depriving [Petitioner] of his due process right to a fair trial, and trial counsel was ineffective for failing to object to the testimony.

(Pet., ECF No. 1, PageID.2-3.)  On July 17, 2007, the court of appeals granted the motion for remand and directed Petitioner to file a motion seeking an evidentiary hearing on the claims of ineffective assistance of counsel in the trial court within 14 days.

Petitioner filed a motion for an evidentiary hearing and a motion for new trial based on the ineffective assistance of counsel:  (1) counsel was ineffective in introducing and allowing testimony that Petitioner was involved in a white supremacist organization; (2) counsel was ineffective in failing to object to Detective White-Erickson's statement that she had previously investigated Petitioner as part of a larger FBI investigation into the entire white supremacy movement, following the murder of a judge's family in Chicago; (3) counsel was ineffective in failing to object to testimony by Petitioner's cell mate, Joseph Bingamen, that Petitioner was scary and intimidating; and (4) counsel was ineffective in failing to object to Trooper Armstrong's testimony about his investigatory practices, which allegedly bolstered the complainant's allegations. The court held an evidentiary hearing on October 25, 2007.  (10/25/07 Hr'g on Mot. for New Trial, ECF No. 16.)  On May 22, 2008, after receiving additional briefing, the court issued a detailed written opinion denying the motion.  (5/22/08 Cir. Ct. Op. Den. Mot. for New Trial, ECF No. 19.)

On June 23, 2008, appellate counsel filed a supplemental brief on appeal, raising two additional arguments:  (1) the trial court erred in concluding that counsel was not ineffective in introducing evidence that Petitioner was involved in a white supremacist group involved in the murder of the family of a federal judge; and (2) the trial court erred in concluding that counsel was not ineffective in failing to object to the admission of testimony by Trooper Armstrong about the credibility of the complainant's allegations.  (Appellant's Supp. Br. on Appeal, 2, ECF No. 32.)  In an unpublished decision issued on October 14, 2008, the Michigan Court of Appeals denied all appellate grounds and affirmed Petitioner's convictions and sentence.  (10/14/08 Mich. Ct. App., ECF No. 32.)

Petitioner filed an application for leave to appeal to the Michigan Supreme Court.

Petitioner sought leave to appeal the three original issues presented to and rejected by the Michigan

Court of Appeals, together with the following claim:

> The cumulative effect of counsel's errors is so great that the outcome of the proceedings is unreliable, where multiple egregious incidents of prosecutorial misconduct occurred without objection, counsel failed to investigate or to present a meaningful defense, sentencing was improperly enhanced, clearly stronger issues on appeal were neglected, and counsel deprived [Petitioner] of his right to a lie detector test.

(Def.-Appellant's Appl. for Leave to Appeal, ECF No. 33.)  On April 28, 2009, the Michigan

Supreme Court denied Petitioner's application for leave to appeal because it was not persuaded that

question presented should be reviewed by the court.  (4/28/09 Mich. Order, ECF No. 33.)

III.   Postconviction Review

Petitioner, through habeas counsel, filed a motion for relief from judgment in the

Emmet County Circuit Court on July 12, 2010, raising the first three issues presented in his habeas

petition, together with the following fourth issue:

> [PETITIONER] WAS AND CONTINUES TO BE DENIED HIS RIGHT TO A FAIR TRIAL, AND HIS RIGHT TO ENGAGE STATE POSTCONVICTION PROCEEDINGS AND LATER FEDERAL HABEAS REVIEW, IN VIOLATION OF THE DUE PROCESS CLAUSES OF THE UNITED STATES AND MICHIGAN CONSTITUTIONS (US CONST, AM V; CONST 1963, ART 1 § 17) WHERE THE *STANAWAY* PROCEDURES WITH RESPECT TO COMPLAINANT'S PSYCHIATRIC RECORDS WERE NOT ENGAGED, AND WHERE OTHER DISCOVERY FAILURES ON POSTCONVICTION CONTINUE TO PREJUDICE THE DEFENSE.   THIS COURT SHOULD GRANT [PETITIONER'S] REQUEST FOR RELEASE OF EVIDENCE PREVIOUSLY PROVIDED TO THE DEFENSE BUT LOST DUE TO NEGLIGENCE OF TRIAL AND DIRECT APPEAL COUNSEL UNDER STATE AND FEDERAL DUE PROCESS GUARANTEES (US CONST, AM V; CONST 1963, ART 1, § 17.

(Pet'r's Mot. for Relief from J., 7, ECF No. 23.)  In a lengthy and scathing opinion issued on July

15, 2011, the circuit court rejected all arguments.  The court expressly held that, because Petitioner

could not demonstrate the existence of a "significant possibility that [he was] innocen[t] of the

crime," he was required under MICH. CT. R. 6.508(D) to show both good cause for his prior failure

to raise his grounds (on direct appeal or in the earlier motion for new trial) and actual prejudice.

(7/15/11 Cir Ct. Op. Den. Relief from J., 2, ECF No. 20.)  In reaching its decision that Petitioner

could not show actual innocence to excuse his default, the court enumerated specific examples of

why Petitioner lacked  credibility at trial, concluding with the following:

> In summary, Defendant admitted key aspects of the accusations against him.  His demeanor, language and appearance while testifying strongly corroborated the prosecution's case.  To the extent that he denied certain allegations, his lack of credibility was palpable.  For the above reasons, the Court finds there is not a significant possibility that Defendant is innocent.

(*Id.*, 6.)  The court then detailed its reasons over the next seven pages for holding that Petitioner

could not demonstrate either the requisite cause or actual prejudice for failing to raise the claims on

direct appeal, because he could not show either that counsel was ineffective or actual prejudice

caused by the alleged errors.  (*Id.*, 6-11.)

Petitioner sought leave to appeal to the Michigan Court of Appeals, raising the first

three grounds presented in the motion for relief from judgment.  On December 27, 2011, the court

of appeals denied Petitioner's application for leave to appeal "for failure to meet the burden of

establishing entitlement to relief under MCR 6.508(D)."  (12/27/11 Mich. Ct. App. Order, ECF No.

34.)  He sought leave to appeal to the Michigan Supreme Court, which, on October 22, 2012, denied

Petitioner's application for leave to appeal on the same basis.  (10/22/12 Mich. Ct. Order, ECF No.

35.)

On November 2, 2012, Petitioner filed his petition for federal habeas corpus relief. (Pet., ECF No. 1.)

## Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996, PUB. L. 104-132, 110 STAT. 1214 (AEDPA). *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). The AEDPA has "drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). This standard is "intentionally difficult to meet." *Woods v. Donald*, 575 U.S. __, 135 S. Ct. 1372, 1376 (2015) (internal quotation marks omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655. In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Lopez v. Smith*, 135 S. Ct. 1, 3 (2014); *Bailey*, 271 F.3d at 655. Moreover, "clearly established Federal law" does not include decisions of the Supreme Court

announced after the last adjudication of the merits in state court. *Greene v. Fisher*, 132 S. Ct. 38 (2011). Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits. *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 132 S. Ct. at 44).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts. *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405-06). "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 2015 WL 1400852, at *3 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). In other words, "[w]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims." *White v. Woodall*, 572 U.S. ___, 134 S. Ct. 1697, 1705 (2014) (quotations marks omitted).

Where the state appellate court has issued a summary affirmance, it is strongly presumed to have been made on the merits, and a federal court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA. *See Harrington*, 562 U.S. at 99; *see also Johnson v. Williams*, 133 S. Ct. 1088, 1094 (2013); *Werth v. Bell*, 692 F.3d 486, 494 (6th Cir. 2012) (applying *Harrington* and holding that a summary denial of leave to appeal by a Michigan appellate court is considered a decision on the merits entitled to AEDPA deference). The

presumption, however, is not irrebuttable. *Johnson*, 133 S. Ct. at 1096. Where other circumstances indicate that the state court has not addressed the merits of a claim, the court conducts *de novo* review. *See id.* (recognizing that, among other things, if the state court only decided the issue based on a state standard different from the federal standard, the presumption arguably might be overcome); *see also Harrington*, 562 U.S. at 99-100 (noting that the presumption that the state-court's decision was on the merits "may be overcome when there is reason to think some other explanation for the state court's decision is more likely"); *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

### **Discussion**

### I.   Motion for Evidentiary Hearing

Petitioner seeks an evidentiary hearing to develop the ineffective-assistance-of-counsel claims raised in his motion for relief from judgment. Following enactment of the AEDPA, federal habeas courts have limited discretion to take new evidence in an evidentiary hearing. *See Cullen v. Pinholster*, 131 S. Ct. 1388, 1400-01 (2011); *see also Sheppard v. Badley*, 657 F.3d 338, 343 (6th Cir. 2011). Under 28 U.S.C. 2254(e)(2), if an applicant has failed to develop a record in

state court, a federal court on habeas review may grant a hearing only when the petitioner can

demonstrate both of the following:

> (A)   the claim relies on
>
> > (i)    a new rule of constitutional law, made retroactive to cases on
> > collateral review by the Supreme Court, that was previously
> > unavailable; or
> >
> > (ii)   a factual predicate that could not have been previously discovered
> > through the exercise of due diligence; and
>
> (B)   the facts underlying the claim would be sufficient to establish by clear and
> convincing evidence that but for constitutional error, no reasonable factfinder
> would have found the applicant guilty of the underlying offense.

*Id.*   Moreover, where the issue was adjudicated on the merits in the state court proceedings, the

Supreme Court has held that federal habeas corpus "review under § 2254(d)(1) is limited to the

record that was before the state court . . . ." *Pinholster*, 131 S. Ct. at 1398.  In such circumstances,

a federal habeas court is barred from holding an evidentiary hearing.  *Id.*

Here, the trial court thoroughly evaluated Petitioner's proffered evidence and rejected

his claims on the merits.  Petitioner nevertheless complains that he was diligent in seeking an

evidentiary hearing.  He argues that, given the substantial evidence proffered in his motion and his

habeas petition, he should have been permitted to develop the facts at an evidentiary hearing.

Even assuming that Petitioner was diligent in developing his evidence, Petitioner

cannot meet the second requirement of § 2254(e)(2).  As the trial court held, and as this Court

discusses at length, *infra*, Petitioner's proffered evidence falls far short of "clear and convincing

evidence that but for constitutional error, no reasonable factfinder would have found [Petitioner]

guilty . . . ."  Petitioner therefore fails to demonstrate entitlement to an evidentiary hearing.

II.      Grounds I, II, & III:  Ineffective Assistance of Counsel

In Ground I of his petition, Petitioner argues that his Sixth Amendment right to the effective assistance of counsel was violated when his attorney failed to interview and present witnesses and failed to investigate and present facts which would have supported Petitioner's claim that the sexual conduct was consensual and that the complainant's testimony was not credible.  In Ground II, Petitioner argues that, because he was denied the effective assistance of counsel in the ways discussed in Ground I, he was effectively denied his right to present a defense in violation of the Due Process Clause and the Confrontation Clause.  In Ground III, Petitioner claims that he was deprived of effective assistance of appellate counsel because he failed to include "dead bang winner" issues, i.e., Grounds I and II, on direct appeal.  Because the three grounds are intertwined, the Court will address them together.

In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel.  To establish a claim of ineffective assistance of counsel, the petitioner must prove:  (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.  The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy.  *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack).  The court must determine whether, in light of the circumstances as they existed

-19-

at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.  Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691.  On the prejudice prong, petitioner "must show there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

In evaluating the effectiveness of appellate counsel under the *Strickland* standard, courts have recognized that an appellant has no constitutional right to have every non-frivolous issue raised on appeal.  "'[W]innowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983)).  To require appellate counsel to raise every possible colorable issue "would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions." *Strickland*, 466 U.S. at 688.  As the Supreme Court has observed, it is difficult to demonstrate that an appellate attorney has violated the performance prong where the attorney presents one argument on appeal rather than another. *Smith v. Robbins*, 528 U.S. 259, 289 (2000).  In such cases, the petitioner must demonstrate that the issue not presented "was clearly stronger than issues that counsel did present." *Id.*

In addition, evaluation of claims of ineffective assistance of counsel are subject to an even higher standard of deference on habeas review.  As the Supreme Court repeatedly has recognized, when a federal court reviews a state court's application of *Strickland* under § 2254(d), the deferential standard of *Strickland* is "doubly" deferential. *Harrington v. Richter*, 562 U.S. 86,

105 (2011) (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)); *see also Burt v. Titlow*, 134 S. Ct. 10, 13 (2013); *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011); *Premo v. Moore*, 562 U.S. 115, 122 (2011). In those circumstances, the question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*; *Jackson v. Houk*, 687 F.3d 723, 740-41 (6th Cir. 2012) (stating that the "Supreme Court has recently again underlined the difficulty of prevailing on a *Strickland* claim in the context of habeas and AEDPA . . . .") (citing *Harrington*, 562 U.S. at 102).

According to Ground I of the petition, defense counsel failed to investigate prior statements made by Petitioner and the complainant and failed to introduce critical impeaching material from those statements. Petitioner also argues that his attorney failed to investigate and present fact witnesses and general facts pertaining to the complainant's credibility. (Pet., 5-6, ECF No. 1, PageID.5-6; Pet'r's Br., viii, 19-39, ECF No. 1, PageID.19, 39-59.) In Ground II, Petitioner contends that the failures to present the evidence described in Count I, the trial court's decision to disallow evidence, and police and prosecutorial intimidation of witnesses, deprived him of his right to present a defense. Petitioner's claims of ineffective assistance of trial counsel are those presented by Petitioner in his motion for relief from judgment, as opposed to those presented on direct appeal.

In support of his motion for relief from judgment, Petitioner proffered a variety of evidence to the trial court. Specifically, he attached police reports containing statements made by Wiertalla, which he contends could have been used to cross-examine Wiertalla. In addition, he attached the affidavits of Petitioner, investigator Julianne Cuneo, Loretta Sue Perry, Erin Meghan Wood, and Robert Poppell. Investigator Cuneo, who was hired by postconviction counsel (counsel in these habeas proceedings), averred that she had contacted the other affiants, as well as the

following additional witnesses: (1) Brandie DeGroff, who had previously been in a relationship with Petitioner and could testify that he was not violent and that she had seen him bruised from, she believed, attacks by Wiertalla.  DeGroff also said that her mother, Kerry McGinn, had witnessed the altercation between Petitioner and Wiertalla in the summer of 2005 and felt intimidated into not coming forward; (2) Jessica Maine Good, who could testify that Wiertalla had been caught shoplifting; (3) Alechia Rocheleau, who could testify that she was once solicited by Wiertalla for sex; (4) Audra Farnsworth, who had a friend who was involved with Petitioner in 2004 and knew he that had not been violent and that Wiertalla was jealous of Petitioner's relationship with Farnsworth; (5) Mary Phillips, whose brother, Leon Kerberskey, was the father of one of Wiertalla's children, claimed that Wiertalla had attacked Kerberskey on multiple occasions; and (6) Adam Paskle, who claimed that Wiertalla had left the scene when her brother was in distress and dying because she was on probation and had been drinking.  All of the witnesses indicated that trial counsel had never talked to them.  Cuneo also stated that, on October 11, 2010, while she was conducting her investigations, she was approached by State Trooper Briolat about the nature of her investigation, an inquiry Cuneo viewed as attempted intimidation.

Loretta Sue Perry averred that she had helped Petitioner to file his motions in the Michigan Supreme Court, because she and her husband were concerned that he had not received a fair trial.  On July 21, 2009, while Perry was visiting a friend, Emmet County Sergeant Miles came to the home, indicating that Emmet County had requested that he investigate.  Miles asked numerous questions about her involvement with Petitioner, her FOIA requests, her involvement with white supremacy groups, and personal information about her family.  Perry felt threatened.

-22-

Erin Wood averred that she was friends with Wiertalla and worked with her at the McDonald's in Petoskey for some months in 2005 until she left town in August 2005. Wood saw Wiertalla and Petitioner argue, but never saw them to be vicious or violent. She had candid discussions about sex with Wiertalla, and she understood that Petitioner and Wiertalla had an active and experimental sex life. She never heard that Wiertalla was forced to do any sexual act.

Robert Poppell provided an affidavit saying that he was close friends with Wiertalla and Petitioner for several years. He lived with the couple for two weeks before Petitioner went to Florida, and he moved back into the home after Petitioner was arrested, ostensibly to help Wiertalla with the children and work around the house. Poppell averred that Wiertalla and Petitioner had a rocky relationship and beat on one another when they argued, but they were never vicious. Poppell claimed that he would have noticed any sexual violence or Wiertalla's fear of Petitioner, if it had occurred. Poppell indicated that, although Petitioner was controlling, he did not force Wiertalla to write to prisoners on behalf of the white-supremacy group. Although Poppell was at the sentencing, he claimed that the prosecutor had told him to not come to court during the trial, because he was living with Wiertalla at the time. Poppell stated that, had he been contacted by Petitioner's attorney, he would have testified for Petitioner, despite his relationship with Wiertalla.

In order to excuse his failure to raise these complaints about trial counsel on direct review, as required under MICH. CT. R. 6.508(D)(3), Petitioner argued that his appellate counsel rendered ineffective assistance of counsel by failing to challenge trial counsel's failure to investigate defense witnesses. In a detailed and comprehensive opinion and order denying the claims, the trial court applied MICH. CT. R. 6.508(D)(3), because Petitioner failed to raise the specific claims of

-23-

ineffective assistance of trial counsel on direct review and could not demonstrate actual innocence,[1] he was entitled to relief only if he could show cause for his failure and actual prejudice resulting therefrom. *Id.* The trial court concluded that Petitioner could not demonstrate cause, because he could not show that appellate counsel was ineffective for raising other claims of ineffective assistance of counsel – claims on which he was granted a *Ginther*[2] hearing – rather than the claims at issue in the motion for relief from judgment. The court also found that Petitioner had not shown actual prejudice. The court declined to consider the claims of ineffective assistance of trial counsel and denial of the right to present a defense because Petitioner had failed to overcome the procedural bar of MICH. CT. R. 6.508(D)(3).[3]

Petitioner now attempts to raise his claims of ineffective assistance of trial counsel and denial of the right to present a defense in this Court. Where, as here, a state procedural rule prevents further state consideration of a federal issue, the federal courts ordinarily are precluded from considering that issue on habeas corpus review. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991); *Engle v. Isaac*, 456 U.S. 107 (1982). To determine whether a petitioner procedurally defaulted a federal claim in state court, the Court must consider whether: (1) the petitioner failed to comply with an applicable state procedural rule; (2) the state court enforced the rule so as to bar the claim; and

---

[1]Under MICH. CT. R.6.508(D)(3), a defendant who, in a motion for relief from judgment raises claims that could have been raised on direct appeal but were not must demonstrate good cause for failing to raise the issue on direct appeal and actual prejudice from the alleged error. *Id.* The provision, however, permits a trial court to "waive the "good cause" requirement of subrule (D)(3)(a) if it concludes that there is a significant possibility that the defendant is innocent of the crime." *Id.*

[2] In *People v. Ginther*, 212 N.W.2d 922 (Mich. 1973), the Michigan Supreme Court approved the process of remanding to the trial court for an evidentiary hearing when an appellant has raised claims of ineffective assistance of counsel that require development of a record.

[3]As the Court discusses *infra*, although the trial court did not formally decide Petitioner's first two habeas grounds, it made numerous factual findings about the substance of those claims during the course of deciding whether appellate counsel was ineffective for failing to raise those claims.

(3) the state procedural default is an "independent and adequate" state ground properly foreclosing federal habeas review of the federal constitutional claim. *See Hicks v. Straub,* 377 F.3d 538, 551 (6th Cir. 2004); *accord Lancaster v. Adams*, 324 F.3d 423, 436-37 (6th Cir. 2003); *Greer v. Mitchell*, 264 F.3d 663, 672 (6th Cir. 2001); *Buell v. Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001).   In determining whether a state procedural rule was applied to bar a claim, a reviewing court looks to the last reasoned state-court decision disposing of the claim. *See Ylst*, 501 U.S. at 803; *Guilmette v. Howes*, 624 F.3d 286, 291 (6th Cir. 2010).

   If a petitioner has procedurally defaulted his federal claim in state court, the petitioner must demonstrate either (1) cause for his failure to comply with the state procedural rule and actual prejudice flowing from the violation of federal law alleged in his claim, or (2) that a lack of federal habeas review of the claim will result in a fundamental miscarriage of justice. *See House v. Bell*, 547 U.S. 518, 536 (2006); *Murray v. Carrier*, 477 U.S. 478, 495 (1986); *Hicks*, 377 F.3d at 551-52.   The miscarriage-of-justice exception only can be met in an "extraordinary" case where a prisoner asserts a claim of actual innocence based upon new reliable evidence. *House*, 547 U.S. at 536. A habeas petitioner asserting a claim of actual innocence must establish that, in light of new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt. *Id.* (citing *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

   With respect to the first prong of the procedural default inquiry, the Sixth Circuit has held that a state-court's denial of a motion under MICH. CT. R. 6.508(D)(2), which precludes relief if the claim already was raised and denied in a previous appeal, is a denial on the basis of collateral estoppel, which does not procedurally default claim for habeas relief. *See Amos v. Renico*, 683 F.3d 720, 727 (6th Cir. 2012) (citing *Skinner v. McLemore*, 425 F. App'x 491, 495 (6th Cir. 2011)).   For

a claim that could have been raised in a previous appeal, the defendant is entitled to relief only if he

can establish "good cause" for failing to raise the grounds on appeal and "actual prejudice," as shown

by a "reasonably likely chance of acquittal" or an "irregularity so offensive to the maintenance of a

sound judicial process that the conviction should not be allowed to stand." MICH. CT. R.

6.508(D)(3)(a)-(b).  In assessing how "firmly" a state procedural rule has been established, the

critical inquiry is whether, viewed from the time of the petitioner's later significant actions or

inaction, the petitioner could be deemed to have been apprised of the procedural rule's existence.

*Luberda v. Trippett*, 211 F.3d 1004, 1006-07 (6th Cir. 2000).  Because MICH. CT. R. 6.508(D) was

enacted in 1989 and Petitioner's conviction and appeals took place long after that date, MICH. CT.

R. 6.508(D) was a "firmly established" procedural rule for purposes of Petitioner's action.

*See Luberda*, 211 F.3d at 1007; *Rogers v. Howes*, 144 F.3d 990, 994 (6th Cir. 1998).

        Moreover, with respect to the second prong of the inquiry, it is apparent that the trial

court, which issued the last reasoned opinion in the instant case, clearly enforced the procedural rule:

> In order to secure the postappeal relief which he now seeks, Defendant bears the
> burden of showing "good cause" for his failure to raise the grounds he now asserts
> "on appeal or in the prior motion."  MCR 6.508(D)(3)(a).  Since Defendant has filed
> both a prior motion and an appeal, he must show good cause for his failure to raise
> his claims on both of these earlier occasions.  *People v Clark*, 274 Mich App 248,
> 253; 732 NW2d 605 (2007).
>
> Good cause is established if Defendant proves that appellate counsel was ineffective.
> [*People v*] *Reed*,[449 Mich 375,] 378[; 535 NW2d 496 (1995)]  However, appellate
> counsel is not required to raise all claims of arguable legal merit.  *Id.* at 379.  In *Reed*,
> the Supreme Court addressed the same argument that Defendant presents hers, i.e.
> that appellate counsel was ineffective for not claim that trial counsel was ineffective.
> The Court held:
>
>> "To excuse this double procedural default defendant must 'show that
>> [trial] counsel's performance fell below an objective standard of
>> reasonableness, and that the representation so prejudiced defendant

as to deprive him of a fair trial.' . . . Defendant must also show that appellate counsel's performance fell below and objective standard of reasonableness and was constitutionally deficient.

While not insurmountable, it is clear that this burden is highly demanding." *Reed, supra* at 390.

Further guidance on how to assess claims of ineffective assistance of counsel was provided by the *Reed* Court's quotation from a United States Supreme Court opinion, as follows:

"In order to establish ineffective representation, the defendant must prove both incompetence and prejudice . . . [.] There is a strong presumption that counsel's performance falls within the 'wide range of [reasonable] professional assistance,' . . . [.] The reasonableness of counsel's performance is to be evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances, and the standard of review is highly deferential.

Since 'there are countless ways to provide effective assistance in any given case,' . . . unless consideration is given to counsel's overall performance, before and at trial, it will be 'all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission . . . was unreasonable.

*Reed, supra* at 390-391.

Thus, counsel's performance is not to be judged using hindsight. With regard to appellate counsel, *Reed* instructs that:

"appellate counsel's decision to winnow out weaker arguments and focus on those more likely to prevail is not evidence of ineffective assistance. . . [.] Nor is the failure to assert all arguable claims sufficient to overcome the presumption that counsel functioned as a reasonable appellate attorney in selecting the issues presented."

*Id.* at 391.

At the outset, it must be remembered that Defendant's appellate attorney did raise the issue of ineffective assistance of trial counsel, albeit based upon different alleged errors than those raised now.

Defendant's appellate attorney [] presented the following issues in arguing to this Court that there was ineffective assistance warranting a new trial: (1) That [defense counsel] improperly brought up Defendant's ties to a white supremacist group, then failed to object to testimony from Detective White-Erickson about an investigation concerning whether members of the same group were involved in the murder of a Judge's family member in Chicago; (2) That [defense counsel] was ineffective for failing to object to the testimony from a cell-mate, Joseph Bingaman, which included Bingaman's statements that he was "intimidated" by Defendant; and (3) That [trial counsel] was ineffective for failing to object to testimony from Trooper Armstrong that was improper vouching for the credibility of Angela Wiertalla.

From the opinion of the Michigan Court of Appeals, it appears that [appellate counsel] presented substantially the same allegations of errors and ineffective assistance of trial counsel on direct appeal. Also, Defendant argued to the Court of Appeals that it was reversible error to allow two police witnesses to testify that Defendant "lawyered up" during interrogation, and that the prosecution was guilty of misconduct for eliciting the testimony about the white supremacy group and the Chicago investigation.

Now Defendant says that appellate counsel was ineffective for failing to assert "dead bang winners." These "dead bang winners" are the "denial of the right to present a defense" and the new claims of Defendant that his trial counsel was ineffective. The claim that Defendant was denied the right to present a defense is a reference to his claim of an alleged error in a pretrial ruling by this Court. Concerning the alleged error by this Court, Defendant's Amended Motion for Relief from Judgment asserts:

> "[A] substantial amount of highly beneficial evidence has surfaced as a result of postconviction investigation. This evidence was not presented to Mr. Dufresne's jury at trial due to the trial court's erroneous grant of an omnibus prosecution motion to suppress. . . [.]"[]

The assertion that a pretrial ruling by this Court prevented Defendant from introducing evidence at trial is plainly false. Prior to trial, the prosecution filed a motion in limine, asking this Court for a ruling concerning six categories of potential evidence. In Defendant's written response to the motion, [defense counsel] indicated that the defense did not intend to seek to present evidence falling into three of the categories identified in the motion.

As to the remaining three categories, [defense counsel] argued that a determination of the admissibility would turn on relevance which could not be determined until trial. The Court's ruling agreed with [defense counsel]:

> "Well, the Court agrees that relevance almost always agrees [sic] on context. And things may or may not be relevant depending on what comes up at trial. The Court will grant the motion in limine as to the matters that are uncontested. The Court will likewise grant the motion as to the contested items but with the understanding that a ruling in limine always is subject to being revisited a[t] the time of trial. So, Mr. [defense counsel], the order simply means that you are not to bring up the matters that are covered in items 3, 4, and 6 in the presence of the jury but you may certainly ask for a hearing out of the presence of the jury to have a determination whether or not such things are permissible.[]

From the above, it is clear that this Court did not rule prior to trial that any evidence was inadmissible, only that counsel was not to bring up the matters in question in the presence of the jury. This Court's pretrial ruling did not deny Defendant the right to present a defense.

Ultimately, no request to present the evidence in question was made at trial. MRE 103 provides that error may not be predicated upon exclusion of evidence unless it is offered at trial. Appellate counsel was not ineffective for failing to raise a spurious issue that this Court denied Defendant the right to present a defense.

The rest of Defendant's claims pertaining to appellate counsel rest on the assertion that [appellate counsel] was ineffective for failing to assert that trial counsel [] was ineffective, in the ways now claimed by Defendant. Remembering that appellate counsel's performance is not judged in hindsight, that there are countless ways to provide effective assistance, and that appellate counsel can winnow out weaker arguments to focus on those most likely to prevail, can it be said that the choices made by [appellate counsel] were unreasonable?

Defendant argues that "the ineffective assistance of trial counsel . . . should have been obvious to direct appeal counsel simply by noting that, after an extensive defense witness list was filed, no witnesses were presented."[] There is nothing unusual about the defense in a criminal trial not calling any witnesses to testify. There is nothing unusual about the defense in a criminal case listing numerous witnesses, and then not calling any. So the lack of defense witnesses at trial would not, per se, alert appellate counsel to an appellate issue.

Concerning trial counsel' failure to call any witnesses, Defendant also argues: "A substantial number of witnesses, many of whom were on a defense witness list . . . could have testified in favor of Mr. Dufresne's position . . . [.]"[] Contrary to this claim, only two of the eight names listed as witnesses identified as having "surfaced"

in Defendant's postconviction investigation, were witnesses listed on Defendant's trial witness list.  Those two listed witnesses are Erin Wood and Alechia Rocheleau.

As to Ms. Wood, Defendant's summary of her pertinent knowledge includes that she was close to Wiertalla through August of 2005.  Most if not all of the coerced sexual acts testified to at trial occurred months later in the time frame of December 2005 to February 2006.  Defendant also says Ms. Wood claims that Wiertalla was a "willing partner" and "seemed to enjoy the 'wild and unusual' sex life" with Defendant.  Evidence of Wiertalla's sexual conduct is generally inadmissible pursuant to the rape-shield statute, MCL 750.520j.  Even if admissible, evidence that Ms. Wiertalla enjoyed a "wild and unusual' sex life would not lend much credence to an argument that she consented to having a child's toy rammed up her anus, or to having Defendant urinate in her mouth, or to licking feces off his penis.

The other listed witness, Alechia Rocheleau, Defendant says could have testified that "Angela Wiertalla came on to her sexually at one time."  If trial counsel knew that this was all Rocheleau had to offer by way of testimony, his failure to contact her is readily understandable and appropriate.  Such testimony would be inadmissible under the rape-shield statute, and of no probative value whatsoever.

Noteworthy as to all the "evidence" presented by Defendant as the fruits of his postconviction investigation, is the absence of any assertion by Defendant that he told [appellate counsel] about this evidence or requested that he investigate any such matters.  Defendant's affidavit dated September 23, 2010 asserts that he "provided names of potential witnesses to . . . [defense counsel,"] and that "I do not believe that [defense counsel] contacted the vast majority of the witnesses. . . [.]"  The affidavit does not assert any discussion of this matter with [appellate counsel], and as noted above, the failure to call listed witnesses to testify at trial is common, and is not something that appellate counsel must investigate sua sponte.

Defendant could have raised these matters on appeal or in a prior motion by bringing them to the attention of appellate counsel.  However, since he failed to do so, [appellate counsel] was not ineffective in this regard.  Appellate counsel is not ineffective in failing to investigate or pursue matters of which he has no knowledge.[21]

A good deal of argument is presented by Defendant going to the proposition that trial counsel [] was ineffective for not doing more to attack the credibility of Ms. Wiertalla, and that appellate counsel was ineffective for not raising [trial counsel's] failing in this regard.  The case at trial did indeed present a credibility contest between Ms. Wiertalla and Defendant.  Trial counsel [] presented a number of matters to raise questions concerning Ms. Wiertalla's credibility.

In his opening statement, [defense counsel] presented the defense position that Wiertalla made up her sexual assault claims against Defendant because he took her child away from her, and her effort to pursue parental kidnaping charges against him

failed.  During his cross examination of Wiertalla, [defense counsel] secured her admission that she first went to Detective White-Erickson seeking parental kidnaping charges to get her son back.[]

Defense counsel's cross examination of Wiertalla started with him extracting her admission that she lied to the police by saying she was beaten by an ex-boyfirend rather than Defendant.[]   [Defense counsel] also brought out through cross examination Wiertalla's admission that she lied to Dr. Minor in claiming that she was beaten by a pregnant girl instead of Defendant.[]  He also brought out that Wiertalla lied to her doctor on another occasion to secure a prescription for Zanax.[]

In addition to securing Wiertalla's admission to several lies, [defense counsel] developed that her efforts to distance herself from Defendant's white supremacist activities might be untruthful, by bringing out that her sign on name to Yahoo was "creator woman."  He brought out that the alleged assaults involving the forcible insertion of the child's toy into her anus resulting in bleeding and repeated forced anal intercourse occurred just a few days before she was seen by Dr. Minor, and that others were present in the home, during a time when she claimed the assaults occurred.

In summary, [defense counsel's] cross examination of Wiertalla, and other evidence brought out by him at trial, presented a factual basis for him to argue that Wiertalla's allegations were false and made up in an effort to secure custody of the party's son, Hale.  While there may have been more evidence available, such as prior inconsistent statements of Wiertalla, that could have been used to attack her credibility, the determination of how much impeachment of her was necessary to persuade the jury that there was reasonable doubt is a classic example of a matter of trial strategy. [Defense counsel] was not ineffective in this regard.

Defendant cites *Mapes v Coyle*, 171 F3d 408 ([6th Cir.]1999) for its discussion of certain factors to be used in evaluating whether appellate counsel was ineffective. Among the factors listed in *Mapes* are "Were the omitted issues clearly stronger than those presented?" and "Was the decision to omit an issue an unreasonable one which only an incompetent attorney would adopt?"   Since the issue of how much impeachment of Wieralla was needed clearly falls within the "wide range of reasonable professional assistance[,"] appellate counsel's omission of this issue was not the omission of an issue clearly stronger that those he presented.  It was not an unreasonable omission which only an incompetent attorney would adopt.  To the contrary, it was entirely reasonable for [appellate counsel] to focus as he did on other issues.

Defendant has failed to establish that his appellate counsel was ineffective, and he has failed to demonstrate good cause for failing to raise the grounds in his postappeal

motion earlier.    Thus, postappeal relief must be denied pursuant to MCR
6.508(D)(3)(a).

> [21] In addition, much other [sic] the "Information Surfaced in Postconviction Investigation" section of
> Defendant's Brief, starting at page 7, would be clearly inadmissible on various grounds including
> relevance, hearsay, rape-shield, MRE 404(a) and MRE 609.

(Op & Ord. Den. Relief from J., 6-10, ECF No. 20 (other footnotes omitted).)    The trial court thus

concluded that Petitioner failed to demonstrate that appellate counsel's performance was inadequate

in any way.    The court held that, because Petitioner could not show that appellate counsel was

ineffective, he could not show cause for failing to raise his first two claims on direct appeal.    He

therefore was not entitled to relief from judgment on those claims.

      In reaching its conclusion that Petitioner had failed to show that appellate counsel was

ineffective, the trial court relied on the standard set forth in *People v. Reed*, 535 N.W.2d 496 (Mich.

1995).    The *Reed* court, in turn, expressly applied the *Strickland* standard, including internal

quotations from both *Strickland*, 466 U.S. at 688, and *Kimmelman v. Morrison*, 477 U.S. 365, 386

(1986)).    The court therefore applied the correct constitutional standard.

      Moreover, the trial court's application of that standard to the claim of ineffective

assistance of appellate counsel was neither contrary to nor an unreasonable application of clearly

established federal law, as determined by the Supreme Court of the United States.    28 U.S.C.

§ 2254(d)(1).    The court's reasoning is both comprehensive and persuasive.    As the trial court

recognized, Petitioner utterly fails even to allege that he told appellate counsel about trial counsel's

failure to interview the witnesses who were not listed on the witness list – an issue not independently

obvious from the record.    As a result, Petitioner cannot show that appellate counsel was ineffective

in failing to investigate them.    (*See* Def.'s Witness & Ex. List, ECF No. 1-7, PageID.162-163.)

Regardless of what evidence those individuals may have provided,[4] Petitioner's failure to demonstrate that the individuals were disclosed to appellate counsel prevents a finding that appellate counsel was ineffective.

In addition, as the trial court also correctly found, the only two witnesses identified in the witness list produced by trial counsel, Erin Wood and Alechia Rocheleau, did not possess evidence that was both admissible and directly relevant to the time period at issue in the case. And neither had personal knowledge of any fact directly in issue in the case. As a result, appellate counsel's decision not to challenge trial counsel's effectiveness for failing to call them as witnesses was entirely reasonable.

Further, notwithstanding Petitioner's strident claims, trial counsel was not ineffective in failing to impeach Wiertalla on each and every discrepancy in her statements and on her past criminal convictions. As the trial court recognized, defense counsel extensively cross-examined Wiertalla and succeeded in impeaching her on a number of matters, including obtaining admissions that she lied to police and her doctor on a variety of occasions. This Court has reviewed the police

---

[4]As the trial court indicated in footnote 21 of its opinion, most of the proposed testimony of these witnesses is of limited relevance or barred by a Michigan court rule or statute. As the trial court observed, the fact that Wiertalla may generally have enjoyed sexual experimentation or may have solicited a coworker for sex falls far short of suggesting that she consented to the conduct at issue here. Even if not barred by the rape-shield statute, such evidence would have done little to undermine her credibility. In addition, the proposed testimony of Robert Poppell is patently unbelievable. Poppell's assertions – that he was unaware at the time of the trial that Wiertalla was accusing Petitioner of rape and sexual violence and that he would have testified for Petitioner – utterly defy belief, in light of the fact that Poppell was living with Wiertalla at the time of the trial. Further, Petitioner provides only hearsay evidence of what witnesses Alechia Rocheleau, Brandi Degroff, Audra Farnsworth, Mary Phillips and Adam Paskle might say, as he fails even to provide affidavits from these individuals. And Degroff, Farnsworth, and Phillips themselves merely told the investigator about things that others had told them. As a result, most of the so-called "evidence" upon which Petitioner relies consists of hearsay within hearsay, which would be wholly inadmissible at trial. Finally, the affidavit of Loretta Sue Perry, which involved alleged police intimidation in July 2009, three years after the trial, is irrelevant to Petitioner's claim that police or the prosecutor prevented witnesses from coming forward at trial. Moreover, in an order denying Petitioner's motion to disqualify the judge, the trial court explained why police likely approached Perry in July of 2009: the police were investigating an ultimately unsubstantiated letter received by the judge, which stated that Petitioner was threatening the judge. (*See* 10/28/09 Cir. Ct. Order, ECF No. 26.)

statements attached by Petitioner to his brief, as well as Wiertalla's  preliminary examination testimony.  While those documents contain some inconsistencies with Wiertalla's trial testimony that could have been the subject of additional cross-examination, most aspects of her police statements and preliminary examination testimony were consistent with her trial testimony.   Nevertheless, reasonable attorneys could have differed in deciding which issues to raise on cross-examination, and competent counsel could well have concluded that focusing on minor discrepancies would obscure the significance of the admissions counsel had obtained from Wiertalla on cross-examination. Therefore, the trial court reasonably concluded that defense counsel was not ineffective in cross-examining Wiertalla.  Because Petitioner's complaint about trial counsel's performance during cross-examination lacked merit, appellate counsel was not ineffective in failing to raise that claim on appeal.

Petitioner next suggests that appellate counsel was ineffective in failing to raise the issue presented in Ground II of the habeas application:  Petitioner's claim that he was denied his right to present a defense when the trial court affirmatively ruled that Petitioner could not introduce evidence of Wiertalla's criminal record, her past accusations of criminal sexual conduct, and her past drug use and mental health status.  The argument is specious.

The prosecutor filed a motion in limine to exclude a variety of evidence:  (1) evidence of the victim's prior and subsequent sexual conduct with Petitioner and others under the Rape Shield Law; (2) unsubstantiated allegations that the victim had accused others of criminal sexual conduct against her, under MICH. R. EVID. 403; (3) the victim's mental health and psychological and psychiatric care, under MICH. R. EVID. 402; (4) the dismissal of other counts against Petitioner, under MICH. R. EVID. 403 and the Rape Shield Law; (5) the victim's prior criminal record, under MICH.

R. EVID. 609; and (6) the victim's prior drug use, under MICH. R. EVID. 402.  (*See* Ex. E to Pet., ECF

No. 1-7, PageID.162-163.)  Defense counsel filed a response, in which he indicated that he did not

intend to inquire about the first two issues or the fifth issue.  However, defense counsel indicated that

he should not be precluded from inquiring into issues (3), (4), and (6).  Specifically, Petitioner

should not be barred from questioning the victim about her psychiatric history, including her

propensity for self-mutilation and the ways in which her psychiatric history related to her credibility.

He also contended that he should be permitted to inquire about inconsistent statements from the

complainant that related to charges the prosecution opted to dismiss.  Finally, defense counsel

indicated that, if the issue of drug or alcohol use arose at trial in relation to her ability to recall facts,

he should be permitted to inquire about it.   (*Id.*, PageID.164-165.)

   The trial court held a hearing on the prosecution's motion on August 11, 2006.  The

court recognized that the parties had no dispute about three of the matters raised in the motion.  As

to the other three matters, the trial court agreed with defense counsel that the relevance of those

subjects would depend on what came up at trial.  As a consequence, the court granted the

prosecutor's motion, but with the understanding that the issues could be revisited at trial.  Defense

counsel was advised not to bring up matters covered in issues (3), (4), and (6), unless he first asked

for a hearing outside of the jury's presence to determine whether such things were permissible.

(Hr'g on Mot. in Limine, ECF No. 11, 4-5.)  Thereafter, defense counsel simply did not seek to

introduce the evidence at trial.

   Regardless, as the trial court suggested in footnote 21 of its opinion, despite

Petitioner's contention that Wiertalla could have been impeached with her past convictions, inquiry

into most of those offenses (operating a motor vehicle while intoxicated, operating a motor vehicle

while under the influence causing injury, and misdemeanor retail fraud of under $200.00) would not have been permitted under MICH. R. EVID. 609(a).  Under Rule 609(a), only crimes that contain an element of dishonesty or false statement or crimes that contain an element of theft are admissible, which would eliminate the intoxicated-driving offenses.  In addition, the rule allows theft crimes to be introduced only if punishable by imprisonment for over one year.  The misdemeanor of third-degree retail fraud is punishable by a maximum of 93 days.  MICH. COMP. LAWS § 750.365d(4). Where a claim lacks merit, appellate counsel is not ineffective in declining to raise the issue on direct appeal.  *See Moore v. Mitchell*, 708 F.3d 760, 776 (6th Cir. Feb. 26, 2013) ("[A] petitioner cannot show that appellate counsel was ineffective for failing to raise a claim on appeal if the underlying claim itself lacks merit."); *Burton v. Renico*, 391 F.3d 764, 781-82 (6th Cir. 2004) (where claim of prosecutorial misconduct lacks merit, counsel is not ineffective in declining to raise issue on appeal).

In contrast to the weaknesses in the issues raised in Grounds I and II of the petition, appellate counsel raised multiple other alleged instances of ineffective assistance of trial counsel that were substantially stronger:  (1) counsel was ineffective in introducing evidence that Petitioner was involved in a white supremacist group; (2) counsel failed to object to Detective White-Erickson's testimony that she had previously investigated Petitioner's possible association with a white supremacist organization that was erroneously thought to have been involved in the murder of a Chicago judge's family; (3) counsel failed to object to Joseph Bingamen's testimony that Petitioner was scary and intimidating; and (4) counsel failed to object to Trooper Armstrong's testimony about his investigatory practices, which purportedly bolstered Wiertalla's testimony.  The court of appeals remanded the claims of ineffective assistance of trial counsel for a *Ginther* hearing, which the trial court held on October 25, 2007.  (10/25/07 Hr'g Tr., ECF No. 16.)

-36-

The claims of ineffective assistance of counsel that were raised on direct appeal undoubtedly were substantial, even though they did not result in a reversal of Petitioner's conviction.[5]   Trial counsel's decision to raise the white-supremacy issue was, on its face, a questionable decision, despite the fact that the court ultimately concluded that counsel had multiple good reasons for raising the issue at voir dire to determine juror prejudices:  (1) the existence of pretrial publicity made inquiry about the issue necessary at voir dire; (2) the matter was likely to come up at trial, given that Petitioner's and Wiertalla's involvement in the movement was intertwined with the factual history; and (3) Wiertalla was likely to accuse Petitioner of forcing her to participate in the movement, and defense counsel wanted to impeach her with her own screen name.  Similarly, trial counsel's failure to object to Detective White-Erickson's testimony about investigating Petitioner in relation to the murder of a judge's family was facially objectionable. Indeed, trial counsel admitted at the *Ginther* hearing that he should have objected.  (ECF No. 16, 9.) Counsel also admitted at the hearing that Bingamen's testimony was objectionable on at least two bases.  (*Id.*, 10.)  In other words, the ineffective-assistance-of-counsel claims raised by appellate counsel in his motion for new trial were far stronger than those presented in the motion for relief from judgment.

In sum, Petitioner fails to demonstrate that the state court erred in concluding that the issues appellate counsel failed to raise in the motion for new trial and on direct appeal were clearly stronger than those he did raise.  *Smith*, 528 U.S. at 289.  He therefore fails to overcome the double deference accorded the state court's application of the *Strickland* standard on habeas review.

---

[5]The Court notes that Petitioner does not challenge the Michigan Court of Appeals' rejection of the claims of ineffective assistance of trial counsel that were raised on direct appeal.

*Harrington*, 562 U.S. at 105 (citing *Knowles*, 556 U.S. at 123); *Burt*, 134 S. Ct. at 13; *Pinholster*, 563 U.S. at 190; *Premo v. Moore*, 562 U.S. at 122.

Because Petitioner fails to demonstrate that appellate counsel was ineffective, he cannot demonstrate cause that would excuse his procedural default of Grounds I and II.  *See House*, 547 U.S. at 536; *Murray*, 477 U.S. at 495.  Petitioner also has not demonstrated that manifest injustice would result from the procedural bar, because he has not made a colorable claim of innocence – he has not shown that any constitutional error "probably" resulted in the conviction of one who was actually innocent.  *Schlup*, 513 U.S. at 322 (citing *Murray*, 477 U.S. at 495).  This requires a showing "that 'in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'"  *Coleman*, 244 F.3d at 540 (quoting *Schlup*, 513 U.S. at 329).  As fully discussed, *supra*, Petitioner's proposed new evidence is largely inadmissible.  Moreover, even if admissible, the proposed evidence is at best insubstantial or, with respect to Robert Poppell, patently lacking in credibility.  The evidence therefore falls far short of meeting the *Schlup* standard.

For all these reasons, the trial court's denial of Petitioner's third habeas ground – ineffective assistance of appellate counsel – constituted a reasonable application of clearly established Supreme Court precedent.  Further, because Petitioner cannot demonstrate cause excusing his failure to raise Grounds I and II on direct appeal, those claims are procedurally barred on habeas review.

III.  Ground IV:  Unreasonable Application of *Doyle v. Ohio*

  In Ground IV of his petition, Petitioner argues that the Michigan Court of Appeals unreasonably applied *Doyle v. Ohio*, 426 U.S. 610, 619 (1976), and issued a decision contrary to *Doyle*, when it cited a state case for the proposition that failure to "impugn the request for counsel" or "create any inference from invocation of their right to counsel" absolved the State from the consequences of repeated *Doyle* error.  (Pet. at 6, ECF No. 1, PageID.6; Pet'r's Brief at viii, 55-59, ECF No. 1, PageID.19, 75-79.)

  The Fifth Amendment of the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself."  In order to prevent coercive custodial interrogations designed to undermine the Fifth Amendment, the Supreme Court held in *Miranda v. Arizona*, 384 U.S. 436 (1966) that, when an individual is in custody, law enforcement officials must warn the suspect before his interrogation begins of his right to remain silent, that any statement may be used against him, and that he has the right to retained or appointed counsel.  *Id*. at 478–79.  Under *Miranda*, evidence of a defendant's custodial statement may only be introduced as evidence of guilt at trial if the defendant was first given such warnings.  *Id.* at 479.

  In *Doyle*, 426 U.S. at 619, the Supreme Court considered whether a defendant's silence during a custodial interrogation could be used, not as evidence of guilt, but to impeach the defendant's testimony at trial.  The Court held "that the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving Miranda warnings, violated the Due Process Clause of the Fourteenth Amendment."  The theory underlying *Doyle* is that, while *Miranda* warnings contain no express assurance that silence will carry no penalty, "such assurance is implicit to any person who receives the warnings."  *Id.* at 618.  On this reasoning, the Court concluded that it would

be fundamentally unfair first to induce a defendant to remain silent through *Miranda* warnings and then to penalize the defendant who relies on those warnings by allowing the defendant's silence to be used to impeach an exculpatory explanation offered at trial. *Id.*

However, the Supreme Court has declined to extend *Doyle* to other circumstances. *See, e.g., Salinas v. Texas*, ___ U.S. ___, 133 S. Ct. 2174, 2179–80 (2013) (holding that pre-arrest, pre-*Miranda* silence may be used to impeach a witness unless the witness had expressly invoked his right to silence); *Jenkins v. Anderson*, 447 U.S. 231, 236 (1980) (concluding that pre-arrest silence may be used to impeach a defendant's credibility at trial). In *Fletcher v. Weir*, 455 U.S. 603, 605–06 (1982), the Court expressly held that post-arrest, pre-*Miranda* silence can be used to impeach a criminal defendant's subsequent testimony at trial, because the government had not induced the defendant to remain silent by giving the *Miranda* warning. The *Fletcher* Court explained that *Doyle*'s prohibition on the use of post-arrest silence to impeach was based, not on the Fifth Amendment right to silence, but solely on the fact that affirmative assurances had been given in the *Miranda* warnings. *Id.*; *see also Brecht v. Abrahamson*, 508 U.S. 619, 628 (1993) (citing *Fletcher* and upholding use of a defendant's post-arrest, pre-*Miranda* silence).

In the instant case, Petitioner complained that two police officers, Armstrong and White-Erickson, testified that, after speaking with them for some time, Plaintiff requested a lawyer. (TT I, 177; TT II, 102-03.) One officer indicated that Petitioner had "lawyered up," an allegedly demeaning characterization of the request for a lawyer, (TT I, 177.)

On direct appeal, the Michigan Court of Appeals cited *Doyle*, as well as *People v. Dennis*, 628 N.W.2d 502 (Mich. 2001). Citing *Dennis*, the court held that, because both officers' statements were made in response to the prosecutor's open-ended questions, the remarks were

relatively brief, and the prosecutor made no attempt to impugn the right to counsel, the statements did not deprive Petitioner of a fair trial.  628 N.W.2d at 509.

   For the purposes of argument, the Court will assume without deciding that the officers' statements about Petitioner's request for counsel, violated *Doyle*.  Nevertheless, Petitioner is not entitled to habeas relief.  On habeas review, a court must assess whether a trial-court error was harmless under the standard set forth in *Brecht*, 508 U.S. 619, regardless of whether the state appellate court recognized the error and reviewed it for harmlessness.  *See Hargrave v. McKee*, 248 F. App'x 718, 728 (citing *Fry v. Pliler*, 551 U.S. 112,122 (2007)); *see also Vasquez v Jones*, 496 F.3d 564, 574-75 (6th Cir. 2007).  In *Brecht*, the Court expressly held that a violation of the *Doyle* rule was a trial error subject to harmless-error review.  *Brecht*, 507 U.S. at 629.  The *Brecht* standard requires the Court to consider whether the constitutional error in the state criminal trial had a "substantial and injurious effect" on the result.  *Brecht*, 507 U.S. at 638.  In determining whether the restriction was harmless, a court must consider a number of factors, "'includ[ing] the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.'"  *Hargrave*, 248 F. App'x at 728 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986)).

   In the instant case, the officers' statements about Petitioner's request for counsel occurred in the context of the officers describing the statements Petitioner made to them at and after they interviewed him in the Clay County Jail in Florida.  When first advised of his rights, Petitioner elected to talk with officers about some matters.  After describing statements Petitioner made after

-41-

being advised of his rights, Trooper Armstrong indicated that Petitioner had "lawyered up" in describing the end of the interview. (TT I, 177.) His reference was brief, merely indicating the endpoint in the chronology Armstrong provided. Detective-Sergeant White-Erickson's reference occurred as part of her description of Petitioner's repeated efforts to talk to her after invoking his right to counsel. She attempted to make clear that she had not questioned Petitioner after he requested a lawyer, but Petitioner nevertheless made additional statements while she was escorting him back to Michigan. (TT II, 102-03.)

In context, both officers' references to Petitioner's request for counsel were limited, were focused on chronology, and were uninvited by the prosecutor's open-ended questions. The prosecutor made no attempt to highlight the request, to denigrate the right or to make any argument about the significance of the statement. Moreover, both Armstrong and White-Erickson testified that Petitioner talked to them about a number of things, and Petitioner himself testified at trial, undermining any conclusion by the jury that he was unwilling to talk to the police because he was guilty. Further, counsel was able to cross-examine both officers. With Detective-Sergeant White-Erickson, counsel highlighted that the substance of Petitioner's initial remarks to the officers was limited to questions about the charges against him and anger at what he perceived was unfair media attention. (TT II, 120.) With Trooper Armstrong, defense counsel asked a series of questions highlighting that Petitioner had primarily asked the officers about the specifics of the charges against him and why the media had been notified. (TT I, 190-91.) In addition, defense counsel asked questions that undermined any conclusion that the officer had any criticism of Petitioner's request for counsel:

Q.      . . . You don't – there's nothing wrong with him wanting to be represented by an attorney, is there?

A.      No.

Q.      I mean that's his right, isn't it?

A.      Yes, sir.

Q.      So when you said he lawyered up, you weren't trying to say anything bad, were you?

A.      No.

(TT I, 191-92.)

Under all of these circumstances and in the context of the evidence in the case, the Court concludes that any *Doyle* error was harmless.  *Brecht*, 507 U.S. at 629.  The Court therefore denies Petitioner's fourth ground for habeas relief.

IV.     Ground V:  Prosecutorial Misconduct

In Ground V of his habeas application, Petitioner argues that the Michigan Court of Appeals, on direct review, unreasonably applied clearly established United States Supreme Court precedent and unreasonably determined the facts, when it denied Petitioner's claim that the prosecutor engaged in misconduct by asking about Petitioner's membership in a white-supremacist group and suggested that Petitioner had ties to a white-supremacist group that was involved in the murder of a judge's family in Chicago.  (Pet., 6, ECF No. 1, PageID.6; Pet'r's Br., ix, 60-66, ECF No. 1, PageID.19,  80-86.)

In order for a petitioner to be entitled to habeas relief on the basis of prosecutorial misconduct, the petitioner must demonstrate that the prosecutor's improper conduct "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Darden v.*

-43-

*Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).  "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor."  *Smith v. Phillips*, 455 U.S. 209, 219 (1982)).  In evaluating the impact of the prosecutor's misconduct, a court must consider the extent to which the claimed misconduct tended to mislead the jury or prejudice the petitioner, whether it was isolated or extensive, and whether the claimed misconduct was deliberate or accidental.  *See United States v. Young*, 470 U.S. 1, 11-12 (1985).  The court also must consider the strength of the overall proof establishing guilt, whether the conduct was objected to by counsel and whether a curative instruction was given by the court.  *See id.* at 12-13;  *Darden*, 477 U.S. at 181-82; *Donnelly*, 416 U.S. at 646-47; *Berger v. United States*, 295 U.S. 78, 84-85 (1935).

In addition, "[c]laims of prosecutorial misconduct are reviewed deferentially on habeas review."  *Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004) (citing *Bowling v. Parker*, 344 F.3d 487, 512 (6th Cir. 2003)).  Indeed, "[t]he Supreme Court has clearly indicated that the state courts have substantial breathing room when considering prosecutorial misconduct claims because 'constitutional line drawing [in prosecutorial misconduct cases] is necessarily imprecise.'"  *Slagle v. Bagley*, 457 F.3d 501, 516 (6th Cir. 2006) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 645 (1974)).  Thus, in order to obtain habeas relief on a prosecutorial misconduct claim, a habeas petitioner must show that the state court's rejection of his prosecutorial misconduct claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Parker v. Matthews*, 567 U.S. 37, 132 S. Ct. 2148, 2155 (2012) (internal quotation omitted).

-44-

Applying the federal constitutional standard,[6] the Michigan Court of Appeals rejected Petitioner's claim of prosecutorial misconduct at the same time it rejected Petitioner's claim of ineffective assistance of counsel based on the same facts:

Defendant next argues that prosecutor committed misconduct by eliciting testimony about defendant's ties to a white supremacist organization. Similarly, defendant argues that his trial counsel was ineffective for failing to object to this testimony. We review the unpreserved claim of prosecutorial misconduct for plain error affecting defendant's substantial rights. *Carines*, supra at 774. For the preserved claim of ineffective assistance of counsel, we review the trial court's factual findings for clear error and conduct a de novo review of the legal issues. *People v Dendel*, 481 Mich 114, 124; 748 NW2d 859 (2008). We see no misconduct on the part of the prosecutor, and conclude that counsel's performance was effective with regard to the general testimony addressing white supremacist activities.

To establish prosecutorial misconduct in this case, defendant must demonstrate that the evidence regarding the white supremacist activities was inadmissible and that the presentation of that evidence denied defendant a fair and impartial trial. *People v Dobek*, 274 Mich App 58, 63-64; 732 NW2d 546 (2007). We conclude that the general testimony about defendant's involvement in the white supremacist activities was admissible, in that it tended to establish certain aspects of defendant's relationship with the victim. See MRE 401. The testimony was not unduly prejudicial under MRE 403, because defendant himself acknowledged his involvement in the organization and described some of the members' activities. Moreover, as defense counsel explained in the *Ginther* hearing,[] it was necessary to apprise potential jurors of defendant's white supremacist views in order to ensure that the jurors would be able to treat defendant fairly notwithstanding his views. Because the testimony was relevant and admissible, the admission of the testimony did not violate defendant's constitutional rights and defendant's counsel cannot be deemed ineffective for failing to object to the testimony. "Trial counsel cannot be faulted for failing to raise an objection or motion that would have been futile." *People v Fike*, 228 Mich App 178, 182; 577 NW2d 903 (1998).

Similarly, there was no misconduct in the specific questioning of one of the police officers concerning the supremacist organization. Nothing in the prosecutor's questions indicates that the prosecutor was attempting to elicit improper evidence. Although the officer's response, with reference to an FBI investigation of the murder

---

[6]The Michigan Court of Appeals cites *People v. Dobek*, 732 N.W.2d 546 (2007), for the standard of review for prosecutorial misconduct claims. *Dobek*, in turn, cites *People v. Jones*, 662 N.W.2d 376, 381 (Mich. 2003), which relies on both *Darden*, 477 U.S. at 182, and *Young*, 470 U.S. at 12-13.

of a Chicago judge's family, may have been inadmissible, the lack of admissibility cannot be ascribed to any conduct by the prosecutor.

      Defendant's counsel acknowledged at the *Ginther* hearing that he could have asserted an objection to the officer's reference to the Chicago murder. Assuming that the lack of objection was an error by defendant's counsel, no reversal is required unless defendant establishes "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v Washington*, 466 US 668, 694; 104 S Ct 2052; 80 L Ed 2d 674 (1984).

      The record demonstrates that the result of the proceeding would have been the same regardless of the reference to the Chicago murder. The prosecutor presented evidence on each element of each offense, and the sole exculpatory testimony came from defendant. The trial court found at the *Ginther* hearing that defendant's testimony lacked credibility. We defer to the trial court's credibility determinations, *People v Vaughn*, 186 Mich App 376, 380; 465 NW2d 365 (1990), and further note that defendant's coarse, irrational, and often rambling responses would likely undermine his credibility with the jurors. In sum, defendant cannot demonstrate any probability that the result of the trial would have been different had his counsel objected to the challenged testimony.

(10/14/08 Mich. Ct. App. Op., 2-3, ECF No. 32.) Thus, the court of appeals approved the trial court's determination that information about Petitioner's membership in a white-supremacist group was both relevant to the case and reasonable for defense counsel to have raised during the voir dire. As previously discussed, defense counsel reasonably raised the question during voir dire to ensure that jurors could render a fair verdict, notwithstanding Petitioner's political beliefs. Once defense counsel had opened the door to this issue, he had little basis for objecting to the prosecutor's questions on the issue. *See Benton v. Booker*, 403 F. App'x 984, 985 (6th Cir. Dec.15, 2010) (no prosecutorial misconduct where the prosecuting attorney commented on a matter to which defendant had previously "opened the door").

      In addition, even if Detective White-Erickson's reference to her earlier investigation of Petitioner was improper, the description was placed in context by both the prosecutor and defense

counsel. White-Erickson clearly told the jury that she was not pursuing a case against Petitioner, that she ultimately found nothing to link Petitioner to the creativity movement, or the movement to the murders, and that the creativity movement had nothing to do with her motivation in investigating case. (TT II, 106, 117.) In that context, the impact was less than it might have been.

Further, counsel did not object to the testimony. *See Young*, 470 U.S. at 13. And the the prosecutor never highlighted Petitioner's membership in a white-supremacist group or suggested that jurors should find Petitioner guilty on the basis of his beliefs. As a matter of fact, both in his closing argument and his rebuttal, the prosecutor reminded the jury that their job was "not about judging [Petitioner's] character . . . ." (Rebuttal, TT III, 30.) He reminded the jury that they should judge Petitioner on what he had done, not on whether they liked him or thought he was a decent person. (Closing, TT III, 4.)

Weighing all of the considerations set forth in *Young*, 470 U.S. at 11-12, any misconduct by the prosecutor did not "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181 (internal quotations omitted). Even more clearly, Petitioner cannot show that the state court's rejection of his prosecutorial misconduct claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Parker*, 132 S. Ct. at 2155. His prosecutorial-misconduct claim therefore will be denied.

## Conclusion

In light of the foregoing, the Court will deny Petitioner's application pursuant to Rule 4 because it fails to raise a meritorious federal claim.

**Certificate of Appealability**

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted.   A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001).  Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted.  *Id.* at 467.  Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000).  *Murphy*, 263 F.3d at 467.  Consequently, this Court has examined each of Petitioner's claims under the *Slack* standard.  Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.*  "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims.  *Id.*

The Court finds that reasonable jurists could not conclude that this Court's denial of Petitioner's claims was debatable or wrong.  Therefore, the Court will deny Petitioner a certificate of appealability.

A Judgment and Order consistent with this Opinion will be entered.

Dated:   March 6, 2017                              /s/ Paul L. Maloney
                                                      Paul L. Maloney
                                                      United States District Judge